72 P.3d 1122 (2003)
Stacy Gauthier POSTEMA, personally, and in her capacity as duly appointed personal representative of the Estate of Elijah R. Gauthier, Plaintiff, and Jeff Scarbrough, personally, Appellant,
v.
POSTEMA ENTERPRISES, INC., and Albert J. Postema, personally, Respondents.
No. 50718-4-I.
Court of Appeals of Washington, Division 1.
July 21, 2003.
As Amended August 28, 2003.
*1123 Charles K. Wiggins, Kenneth W. Masters, Wiggins Law Office, Bainbridge Island, WA, Robert K. Dawson, Peter M. Brown, Pence & Dawson, Seattle, WA, for Appellant.
Edwin J. Snook, Snook & Schwanz, Kirkland, WA, Timothy R. Gosselin, Tacoma, WA, for Respondent.
AGID, J.
Jeff Scarbrough brought an action against Albert Postema for the wrongful death of his three-year-old son. Under instructions narrowly defining "support," a jury determined Scarbrough had not regularly contributed to the support of his child's financial well-being and accordingly could not maintain the wrongful death action. After trial, the court ruled that the Legislature's 1998 amendment *1124 to the wrongful death statute stating its intent to expand the definition of support did not make substantive changes in the definition, and it denied Scarbrough's post trial motions. Although we conclude that he did not properly object to the court's definition of "support" at trial, we reach the issue because it is critical to this case and the correct statutory construction is necessary to the correct decision. We conclude the trial court erred in its interpretation of the 1998 amendment because it did change the definition of "support" in RCW 4.24.010 and remand for a new trial under Civil Rule 59(a)(9).

FACTS
On March 10, 2000, three-year-old Elijah Gauthier was riding in a 16-ton Peterbilt dump truck with his half-sister, Monique Postema, and her father, Albert Postema. When the passenger door unexpectedly flew open, Elijah fell under the truck and was killed. Elijah's mother, Stacy Postema, sued her ex-husband Albert under RCW 4.24.010, which creates a cause of action for parents of an injured or dead child. Jeff Scarbrough, Elijah's father, joined the action. After Stacy settled with Albert, Jeff's claim proceeded to trial.
RCW 4.24.010 provides that a parent can only maintain an action for the wrongful death of a child if he or she has "regularly contributed to the support" of the minor child.[1] Jeff argued in his trial memoranda that the court should decide as a matter of law whether he regularly contributed to Elijah's support and had standing to bring the claim.[2] Only after the court makes this threshold determination, he argued, should the jury consider his loss of love, companionship, and the parent/child relationship to assess damages. Although the trial court rejected his motion and submitted the question to the jury, Scarbrough pursued the theory throughout trial that he could bring an action if he regularly contributed to Elijah's material well-being. He presented evidence detailing the monetary contributions he made to support Elijah. He also presented damages testimony from several friends and family establishing his close relationship with his son. This testimony suggested Scarbrough fully exercised his visitation rights under the parenting plan and took additional time with Elijah when he could. He took Elijah fishing, to parks, and to the zoo. He and Stacy took Elijah on vacation together to the Oregon Coast. His neighbors, Frank and Betty Green, testified they saw Jeff with Elijah "five or six hundred times" and they considered him an active father. Frank Green noted that he and his wife raised four children and he "really thought [Jeff] did a little better job with Eli than [he] did with [his] own kids." The owner of the salon where he worked described the relationship between Jeff and his son as "caring" and testified that he had pictures of Elijah at his work station. His stepmother testified that Jeff and Elijah had a very special bond and he "obviously adored [Elijah]." She noted Jeff was with Elijah every moment he could be. Finally, Jeff presented evidence showing that he was devastated by Elijah's death.
After he rested his case, Scarbrough moved for judgment as a matter of law that he had standing to bring the claim, arguing that no reasonable jury could find that he failed to regularly contribute to Elijah's material support. The trial court again denied the motion. In formulating jury instructions, both counsel and the court discussed in detail Jury Instruction 6 which defined "regular" support contributions. Scarbrough submitted the following instruction:

*1125 INSTRUCTION NO. ____
In order for a parent to recover damages for the death of a child, the parent must have regularly contributed to the support of his or her minor child.
The word "regularly" signifies a frequency which is greater than occasional but less than constant. Contributions may be of money, or of material goods, or of the personal efforts of the parent.[3] No specific amount of support is required. Nor is it required that the contribution be made according to a fixed periodic timetable. In making your assessment you are to consider all the factors bearing upon this issue over the life of the parent-child relationship.
It is sufficient if the parent makes reasonable contributions at such time as the needs of the child are apparent, and with due regard to the financial ability of the parent to contribute.
The trial court gave the following version of the instruction:

INSTRUCTION NO. 6
In order for a parent to recover damages for the death of a child, the parent must have regularly contributed to the support of his or her minor child.
"Support" means providing for the child's material well being. This may include the payment of money, or contributing to housing, food, clothing, or healthcare services of the child incurred after his birth. The law does not set a required amount of support.
"Regularly" means consistently, not occasionally or sporadically.
The plaintiff has the burden of proving by a preponderance of the evidence that he regularly contributed to the support of his child. If you find from your consideration of all the evidence that plaintiff has proved that he regularly contributed to the support of the child, your verdict should be for the plaintiff. On the other hand, if plaintiff has not proved he regularly contributed to the support of the child, your verdict should be for the defendant.
Scarbrough objected to Instruction 6 on the same grounds he argued in his motion for judgment as a matter of lawthat whether a parent regularly contributed to his or her child's support is a determination properly made by the court. He also objected to the court's definition of the term "regularly." But he did not object to the definition of the term "support" or the standard a plaintiff must meet to bring a claim under RCW 4.24.010. The court gave the jury a special verdict form asking whether the plaintiff "regularly contributed" to Elijah's support. The jury answered "no" to the question.
After the jury's verdict, Scarbrough moved for a new trial under CR 59 and for a judgment as a matter of law under CR 50. He argued that the legislative intent section of the 1998 statutory amendment to RCW 4.24.010 stating that "support" could include "emotional, psychological, or financial support"[4] meant that no reasonable jury could conclude that he failed to provide the requisite support. He admitted that he failed to discover this uncodified section until after the jury rendered its verdict on what he argues is the wrong legal standard. The trial court denied both motions, and this appeal followed.

ANALYSIS

I. CR 50 Motions for Judgment as a Matter of Law Before and During Trial
"`Granting a motion for judgment as a matter of law is appropriate when, viewing the evidence most favorable to the nonmoving party, the court can say, as a matter of law, there is no substantial evidence or *1126 reasonable inference to sustain a verdict for the nonmoving party.'"[5] Whether a verdict should have been directed is a question of law.[6]
The trial court properly denied Scarbrough's motions for judgment as a matter of law at the close of his case and at the conclusion of the evidence because the evidence presented, when viewed in the light most favorable to the nonmoving party, could sustain a verdict that he did not "regularly" contribute to his child's material well-being. At this point in the proceedings, Scarbrough had not argued that the statute permitted the jury or the court to consider anything other than material support to determine whether he could bring his claim. The evidence showed that he paid child support for 23 of the 39 months Elijah was alive and, except for a short period in August 1999, there was never a child-support order in effect.[7] His own testimony revealed that Stacy reported him twice to the Department of Social and Health Services (DSHS) to enforce the support obligation. George Smylie, a DSHS employee, testified he did not know whether Scarbrough actually made payments because they were not paid through the State, but he said it would be unacceptable to the State if he only provided support 65 percent of the time.[8] Because this evidence could sustain a verdict that Scarbrough did not "regularly" contribute to his child's material well-being, the trial court properly refused to grant the motions for judgment as a matter of law under the standard Scarbrough argued at trial.
The critical question is whether the trial court's decision to deny the final post-trial motion, which presented a new theory of the case, was also proper.

II. Preservation for Review
An appellate court may refuse to review any claim of error which was not raised at the trial court level.[9] The purpose of this general rule is to give the trial court an opportunity to correct errors and avoid unnecessary retrials.[10] A court normally will not vacate a verdict and grant a new trial for errors of law if the party seeking a new trial failed to object to or invited the error.[11]
Postema asserts this court cannot review the alleged error of law because Scarbrough failed to argue the "substantial involvement" standard at trial and therefore failed to preserve the issue for appeal. Scarbrough argues that he preserved the issue by objecting to the erroneous definition of "regularly" in Instruction 6. He asserts he proposed a jury instruction that properly defined "regularly" and incorporated this theory of the case because it would have allowed the jury to consider the "personal efforts of the parent" in determining the amount of "support."[12] He also argues that he preserved the issue by raising it in his post-trial motion, which the trial court improperly denied.
The objection to Instruction 6 was inadequate to preserve the question whether "substantial involvement" in a child's life is the appropriate standard to determine whether a parent may bring a claim for *1127 wrongful death of a child. A general objection or exception is not sufficient because the exception must be sufficient to apprise the trial judge of the nature and substance of the objection.[13] There is no evidence in the record that Scarbrough made any objection to the definition of the term "support" in Instruction 6. In fact, because both parties concede that neither discovered the Legislature's statement of intent until after the jury verdict, Scarbrough could not have objected to the instruction on these grounds or apprised the trial court of a theory of which he was unaware.
Nor was the objection to the instruction in his post-trial motion sufficient to preserve the issue. In reviewing an instructional error, an appellate court considers the objection at the time of trial and the context in which it was made, but it does not consider statements made in motions for a new trial or reconsideration.[14] Scarbrough correctly argues that failure to object to jury instructions does not preclude an appellate consideration of the trial court's denial of a motion for a judgment as a matter of law. But here he not only failed to object properly to Instruction 6, he also argued a position at trial that is inconsistent with the one he advances in his post-trial motion and on appeal.
The court need not entertain arguments that are patently inconsistent with the positions advanced at trial.[15] The Washington Supreme Court has concluded counsel cannot set up an error and then complain of it on appeal.[16] By failing to discover the Legislature's statement of intent before the end of the proceedings and arguing a different standard throughout trial, Scarbrough invited the error and cannot complain on appeal that his own erroneous arguments at trial resulted in the jury finding for the defendant.
But, all this being said, we conclude that determining the meaning of RCW 4.24.010 is critical to this case and resolving it is necessary to making a proper decision.[17] In the interest of justice, we will review the question whether the intent statement adopted by legislative amendment in 1998 expanded the definition of "support" to include non-monetary contributions to a child's life and well-being.

III. Effect of 1998 Amendment
Construction of a statute is a question of law that we review de novo under the error of law standard.[18] A court's principal objective in interpreting a statute is to give effect to the Legislature's intent,[19] and its clear language.[20] If a term is defined in a statute, we must use that definition.[21] Absent a statutory definition, the term is generally accorded its plain and ordinary meaning unless there is a contrary legislative intent.[22] A court should avoid construing a statute in a *1128 manner which renders a provision meaningless.[23]
In Guard v. Jackson, we examined the meaning of the term "support" used in RCW 4.24.010.[24] We concluded RCW 4.24.010 violated the Equal Rights Amendment by creating an impermissible classification on the basis of gender. And, as discussed above, we interpreted the meaning of the word "support" in RCW 4.24.010 as being limited to "material well-being." The appellant in Guard had argued that "support" meant the "expression of love and affection, expression of concern for a child's well-being, and the duty to provide social and moral guidance."[25] Because "`support' generally means providing for a child's needs for housing, food, clothing, education and health care," we construed RCW 4.24.010 "as requiring [a parent] to contribute regularly to the child's material well-being," holding that a parent could meet this standard by showing compliance with a support order.[26] The Washington Supreme Court affirmed our decision.[27] In response to Guard, the Legislature amended the statute, removing the gender-based classification and adding a statement of intent. The amendment stated in part:

NEW SECTION. Sec. 1. It is the intent of this act to address the constitutional issue of equal protection addressed by the Washington state supreme court in Guard v. Jackson, 132 Wash.2d 660, 940 P.2d 642 (1997). The legislature intends to provide a civil cause of action for wrongful injury or death of a minor child to a mother or father, or both, if the mother or father has had significant involvement in the child's life, including but not limited to, emotional, psychological, or financial support.
Sec. 2. RCW 4.24.010 and 1973 1st ex.s. c 154 s 4 are each amended to read as follows:
((The)) A mother or father, or both ((may maintain an action as plaintiff for the injury or death of a)), who has regularly constituted to the support of his or her minor child, ((or)) and the mother or father, or both, of a child on whom either, or both, are dependent for support ((: PROVIDED, That in the case of an illegitimate child the father cannot)) may maintain or join as a party an action ((unless paternity has been duly established and the father has regularly contributed to the child's support)) as plaintiff for the injury or death of the child.
This section creates only one cause of action, but if the parents of the child are not married, are separated, or not married to each other damages may be awarded to each plaintiff separately, as the ((court)) trier of fact finds just and equitable.
If one parent brings an action under this section and the other parent is not named as a plaintiff, notice of the institution of the suit, together with a copy of the complaint, shall be served upon the other parent: PROVIDED, That ((when the mother of *1129 an illegitimate child initiates an action,)) notice shall be required only if ((paternity)) parentage has been duly established ((and the father has regularly contributed to the child's support)).[[28]]
Scarbrough argues the history of the statute[29] combined with the Legislature's statement of intent establishes that it intended to provide a cause of action for parents who provide emotional, psychological, financial or other support for a child, thus superceding Guard's holding that "support" is limited to material support. Postema argues that the 1998 amendment did not substantively change the meaning of "support" in the statute. Rather, it only cured the constitutional deficiency. To interpret the statement of intent as making such a change, he argues, violates the rules of statutory construction. We disagree.
When this court interpreted the meaning of the term "support" in Guard, the statute provided no guidance about its meaning. This is no longer the case because in the face of our contrary definition, the Legislature has now adopted a statement of intent defining the term. Although a court cannot use a statement of intent to contradict the plain language of a statute, clear statements of intent consistent with the statutory language clarify a statute's meaning.[30] And because a court must interpret individual provisions of a statute in the context of the entire act,[31] a clear legislative statement of intent is important to construing the meaning of statutory language. In this case, the Legislature clearly indicated its intent by including in its intent statement a definition for the term "support" that contradicted the Guard court's interpretation of that term. Were we to agree with Postema's position, we would render the Legislature's statement of intent meaningless. This we cannot do.[32] The statement of intent is consistent with the language of the act, so we must give effect to it. Accordingly, we conclude the Legislature's intent provision overrules our definition of "support" in Guard. The jury instruction in this case was erroneous, and the trial court erred by concluding, even when presented with this argument, that the instruction properly stated the law. Because this previously unsettled question of law deprived Scarbrough of his right to recover for his son's death, substantial justice has not been served in this case, and we remand for a new trial under CR 59.[33]
Reversed and remanded.
APPELWICK and SCHINDLER, JJ., concur.
NOTES
[1] RCW 4.24.010.
[2] The only evidence Jeff presented on this issue was of his monetary contributions in the form of child support. In so doing, he relied upon our ruling in Guard v. Jackson, 83 Wash.App. 325, 921 P.2d 544 (1996), aff'd, 132 Wash.2d 660, 940 P.2d 642 (1997).

Where a term is not defined by a statute, the court looks to the statute's subject matter and the context in which the word is used. In the context of statutes dealing with parent-child relations, "support" generally means providing for a child's needs for housing, food, clothing, education and health care. We therefore construe RCW 4.24.010 as requiring the father to contribute regularly to the child's material well-being....
83 Wash.App. at 329, 921 P.2d 544 (citations omitted).
[3] Although at first glance the phrase "personal efforts of the parent" seems to suggest that non-financial contributions could be considered, a discussion between the trial court and the parties clarifies the intended meaning of the phrase. Jeff argued that "personal efforts of the parent" was intended to include improvements Jeff made to his hair salon so that both parents could work there and make money to support the family. The court rejected this type of labor as "support" and refused to include it in the instruction.
[4] Laws of 1998, ch. 237, § 1.
[5] Guijosa v. Wal-Mart Stores, 144 Wash.2d 907, 915, 32 P.3d 250 (2001) (quoting Sing v. John L. Scott, Inc., 134 Wash.2d 24, 29, 948 P.2d 816 (1997)).
[6] Rhoades v. DeRosier, 14 Wash.App. 946, 948, 546 P.2d 930 (1976).
[7] Scarbrough's own records only confirmed 17 of 38 payments, but Stacy Albert's records reflected 23 payments. Although he claimed he made other payments in cash, Stacy disputed his contention. See Guard, 83 Wash.App. at 329, 921 P.2d 544 (concluding that a parent who went for months at a time without making payments and missed more payments than he made did not "regularly contribute" to his child's support).
[8] But the records also show the longest period of time Stacy denies receiving support was during the nine months she and Scarbrough lived together.
[9] RAP 2.5(a).
[10] Demelash v. Ross Stores, Inc., 105 Wash.App. 508, 527, 20 P.3d 447, review denied, 145 Wash.2d 1004, 35 P.3d 380 (2001).
[11] In re K.R., 128 Wash.2d 129, 147, 904 P.2d 1132 (1995).
[12] See also infra n. 8.
[13] Trueax v. Ernst Home Ctr., Inc., 124 Wash.2d 334, 339, 878 P.2d 1208 (1994).
[14] Id. at 340, 878 P.2d 1208.
[15] Kohl v. Zemiller, 12 Wash.App. 370, 373, 529 P.2d 861 (1974).
[16] In re K.R., 128 Wash.2d at 147, 904 P.2d 1132.
[17] Falk v. Keene Corp., 113 Wash.2d 645, 659, 782 P.2d 974 (1989) (permitting review of an instruction despite counsel's inadequate objection because determining the meaning of the act was at the heart of the case and necessary to making a proper decision).
[18] City of Pasco v. Pub. Employment Relations Comm'n, 119 Wash.2d 504, 507, 833 P.2d 381 (1992).
[19] Schumacher v. Williams, 107 Wash.App. 793, 799, 28 P.3d 792 (2001), review denied, 145 Wash.2d 1025, 41 P.3d 484 (2002).
[20] New Castle Invs. v. City of LaCenter, 98 Wash. App. 224, 229, 989 P.2d 569 (1999) (citing People's Org. for Wash. Energy Resources v. Wash. Util. & Transp. Comm'n, 104 Wash.2d 798, 825, 711 P.2d 319 (1985)), review denied, 140 Wash.2d 1019, 5 P.3d 9 (2000).
[21] Id. (citing Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 813-14, 828 P.2d 549 (1992)).
[22] Id. (citing Dennis v. Dep't of Labor & Indus., 109 Wash.2d 467, 479-80, 745 P.2d 1295 (1987)).
[23] State v. Contreras, 124 Wash.2d 741, 747, 880 P.2d 1000 (1994).
[24] 83 Wash.App. 325, 921 P.2d 544 (1996), aff'd, 132 Wash.2d 660, 940 P.2d 642 (1997). In relevant part, before it was amended in 1997, RCW 4.24.010 stated as follows:

4.24.010 Action for injury or death of child
The mother or father or both may maintain an action as plaintiff for the injury or death of a minor child, or a child on whom either, or both, are dependent for support: Provided, That in the case of an illegitimate child the father cannot maintain or join as a party an action unless paternity has been duly established and the father has regularly contributed to the child's support.
This section creates only one cause of action, but if the parents of the child are not married, are separated, or not married to each other damages may be awarded to each plaintiff separately, as the court finds just and equitable.
If one parent brings an action under this section and the other parent is not named as a plaintiff, notice of the institution of the suit, together with a copy of the complaint, shall be served upon the other parent: Provided, That when the mother of an illegitimate child initiates an action, notice shall be required only if paternity has been duly established and the father has regularly contributed to the child's support.
[25] Guard, 83 Wash.App. at 329, 921 P.2d 544.
[26] Id.
[27] 132 Wash.2d 660, 940 P.2d 642 (1997) (the Supreme Court only addressed the question whether the support requirement violates the Equal Rights Amendment, Wash. Const. art. XXI, § 1, and held that it did).
[28] Laws of 1998, ch. 237.
[29] He notes the statute originally provided a cause of action for a father, unless he died or deserted his family. Wilson v. Lund, 80 Wash.2d 91, 102, 491 P.2d 1287 (1971) (Wright, J., concurring) (citing Laws of 1869, ch. 1, § 9, p. 4). He asserts the Legislature's change from "desertion" to "regular contribution" should not be interpreted as a simple mechanical adherence to complying with a child support order.
[30] State v. Wiggins, 114 Wash.App. 478, 482, 57 P.3d 1199 (2002) (concluding if a statute is susceptible to two constructionsone of which will promote the purpose of the statute and the second of which will defeat itthe courts will adopt the former); State, Dept. of Ecology v. Campbell & Gwinn, L.L.C., 146 Wash.2d 1, 11, 43 P.3d 4 (2002) (stating that although the plain meaning rule directs a court to construe and apply words according to the meaning that they are ordinarily given, the rule also permits the court to consider underlying legislative purposes, background facts, and statutory context to determine its plain meaning).
[31] ITT Rayonier, Inc. v. Dalman, 122 Wash.2d 801, 807, 863 P.2d 64 (1993) (a term in a regulation should not be read in isolation but rather within the context of the regulatory and statutory scheme as a whole; statutory provisions must be read in their entirety and construed together, not by piecemeal).
[32] Mitchell v. Bd. of Indus. Ins. Appeals, 109 Wash.App. 88, 91, 34 P.3d 267 (2001) (concluding that a court is obliged to construe a statute in a way that is consistent with its underlying purpose).
[33] On remand the trial court is free to determine, as a matter of law and in view of the evidence presented in the first trial, whether Scarbrough provided sufficient support to recover damages.