[No. 63847-5-I.    Division One.    February 7, 2011.]

THE ESTATE OF ASHLIE BUNCH ET AL., *Plaintiffs*, v. MCGRAW RESIDENTIAL CENTER, *Respondent*, ALEXANDER CHUN ET AL., *Defendants*, AMY KOZEL, *Appellant*.

*Elena L. Garella*; and *Jeffrey L. Herman* (of *Herman Law Firm LLC*), for appellant.

*Pamela M. Andrews* and *Kristen Dorrity* (of *Johnson Andrews & Skinner PS*), for respondent.

¶1 Cox, J. — Amy Kozel appeals the trial court's order denying her motion to intervene in this wrongful death of a child action by Steven Bunch, the personal representative of the child's estate and the child's father. On this record, the trial court did not abuse its discretion in denying Kozel's motion. We affirm.

¶2 The material facts are largely undisputed. They are documented in this record by two declarations, one from each of the deceased child's parents.

¶3 In October 1992, Ashlie Bunch was born to a substance-addicted mother.[1] During their marriage, Steven Bunch and Amy Kozel adopted Ashlie and her younger sister. Bunch and Kozel were then residing in Florida. They divorced in 2001, three years after the two adoptions.

¶4 Thereafter, Bunch moved to Washington. Ashlie and her younger sister remained in Florida with Kozel for the next two years. At some point, Ashlie began to suffer from mental illness. During that time, Bunch regularly paid child support for both children and visited them annually.

¶5 In 2003, Kozel sent Ashlie to live with Bunch in Washington after she began to exhibit abusive behavior toward her younger sister. After she arrived in Washington, Ashlie had several inpatient mental health stays ranging from four days up to five weeks. In March 2007, a court committed her to Kitsap Memorial Hospital for psychiatric treatment based on her self-reporting that she had suicidal thoughts. In May of that year, a court ordered her transferred to McGraw Residential Center for further inpatient psychiatric treatment.

¶6 In January 2008, while in the residential care of McGraw Center, 15-year-old Ashlie took her own life.

¶7 More than a year after Ashlie's death, Bunch, individually and as personal representative of Ashlie's estate, commenced this wrongful death action against McGraw Center and others. He claimed, among other things, a

---

[1] We adopt the naming conventions the parties use in their briefing.

permanent loss of parent-child consortium under RCW 4.24.010. That statute permits the mother, father, or both, of a minor child to sue for that child's death, provided the parent "has regularly contributed to the support of his or her minor child."[2]

¶8 Bunch did not join Kozel to the action. However, pursuant to the provisions of RCW 4.24.010, he provided her with written notice of the suit. Kozel moved to intervene based on her declaration and briefing. Bunch opposed her intervention with his own declaration and briefing. We discuss in more detail these submissions of the parties later in this opinion. The trial court denied the motion to intervene.

¶9 Kozel appeals the order denying her motion to intervene.

## REGULAR CONTRIBUTION TO THE SUPPORT OF ONE'S MINOR CHILD

¶10 Kozel argues that the trial court abused its discretion in denying her motion to intervene. Specifically, she argues that she is entitled to intervene based on RCW 4.24.010 and CR 19. For the first time on appeal, she also argues that she is entitled to intervene based on CR 24.

¶11 We hold that she has failed to show that the trial court abused its discretion in denying her request to intervene based on either RCW 4.24.010 or CR 19. We do not address her new argument on appeal based on CR 24.

■■ ¶12 We review a CR 19 decision for an abuse of discretion, with the caveat that any legal conclusion underlying the decision is reviewed de novo.[3] Under CR 19, the court must determine whether a party is needed for a just adjudication.[4] CR 19(a) provides in part:

---

[2] RCW 4.24.010.

[3] *Gildon v. Simon Prop. Grp., Inc.*, 158 Wn.2d 483, 493, 145 P.3d 1196 (2006).

[4] *Crosby v. Spokane County*, 137 Wn.2d 296, 306, 971 P.2d 32 (1999); CR 19(a).

A person . . . shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (A) as a practical matter impair or impede his ability to protect that interest or (B) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

The court also considers to what extent a judgment rendered in the person's absence might be prejudicial to them, and whether a judgment rendered in the person's absence will be adequate.[5]

¶13 The goal of statutory interpretation is to carry out the intent of the legislature.[6] When engaging in statutory interpretation, this court looks first to the plain language of the statute.[7] This court interprets the words and phrases used in accordance with statutory definitions.[8] In the absence of statutory definitions, standard dictionary definitions control.[9] If the statute's meaning is plain on its face, the inquiry ends.[10] A statute is ambiguous, however, when it is susceptible to two or more reasonable interpretations.[11] But a statute is not ambiguous merely because different interpretations are conceivable.[12]

¶14 When statutory language is unclear, we may review legislative history to determine the scope and purpose of a

---

[5] *Crosby*, 137 Wn.2d at 306-07; CR 19(b).

[6] *Philippides v. Bernard*, 151 Wn.2d 376, 383, 88 P.3d 939 (2004) (citing *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 6, 721 P.2d 1 (1986)).

[7] *State v. Armendariz*, 160 Wn.2d 106, 110, 156 P.3d 201 (2007).

[8] *State v. Watson*, 146 Wn.2d 947, 954, 51 P.3d 66 (2002).

[9] *Id.*

[10] *Armendariz*, 160 Wn.2d at 110.

[11] *Id.*

[12] *Burton v. Lehman*, 153 Wn.2d 416, 423, 103 P.3d 1230 (2005).

statute.[13] Strained meanings and absurd results should be avoided.[14] The meaning of a statute is a question of law that this court reviews de novo.[15]

¶15 RCW 4.24.010 provides in relevant part:

> A mother or father, or both, *who has regularly contributed to the support of his or her minor child* . . . may maintain or join as a party an action as plaintiff for the injury or death of the child.
>
> This section creates only one cause of action, but if the parents of the child are not married, are separated, or not married to each other damages may be awarded to each plaintiff separately, as the trier of fact finds just and equitable.
>
> If one parent brings an action under this section and the other parent is not named as a plaintiff, notice of the institution of the suit, together with a copy of the complaint, shall be served upon the other parent: PROVIDED, That notice shall be required only if parentage has been duly established.
>
> . . . .
>
> In such an action, in addition to damages for medical, hospital, medication expenses, and loss of services and support, damages may be recovered for the loss of love and companionship of the child and for injury to or destruction of the parent-child relationship in such amount as, under all the circumstances of the case, may be just.[16]

¶16 " '[C]auses of action for wrongful death are strictly a matter of legislative grace and are not recognized in the common law.' "[17]

The legislature has created a comprehensive set of statutes governing who may recover for wrongful death and survival

---

[13] *Wash. Fed'n of State Emps. v. State*, 98 Wn.2d 677, 684-85, 658 P.2d 634 (1983).

[14] *State v. Neher*, 112 Wn.2d 347, 351, 771 P.2d 330 (1989).

[15] *Okeson v. City of Seattle*, 150 Wn.2d 540, 548-49, 78 P.3d 1279 (2003).

[16] (Emphasis added.)

[17] *Philippides*, 151 Wn.2d at 390 (quoting *Tait v. Wahl*, 97 Wn. App. 765, 771, 987 P.2d 127 (1999)).

. . . . "It is neither the function nor the prerogative of courts to modify legislative enactments."[18]

Because the legislature has defined who may sue for the wrongful death or injury of a child, this court may not alter the legislative directive.[19]

¶17 This statutory cause of action requires a parent of a minor child to demonstrate that he or she "has regularly contributed" to the "support" of that child to be entitled to relief. Where, as here, these statutory terms are not defined by the legislature, we may examine the relevant statement of legislative intent and relevant case authority to assist us in determining legislative intent.[20] We may also look to standard dictionary definitions to assist in determining that intent.[21]

¶18 We turn first to the word "support." Both the 1998 statement of legislative intent accompanying the amendment of this statute and the relevant case authority are instructive.

¶19 In *Guard v. Jackson*,[22] the supreme court held that a former version of RCW 4.24.010 violated Washington's equal rights amendment to the state constitution.[23] Responding to that case, the legislature amended the statute in 1998 and provided its statement of intent regarding that amendment:

It is the intent of this act to address the constitutional issue of equal protection addressed by the Washington state supreme court in *Guard v. Jackson*, 132 Wn.2d 660 (1997). The legisla-

---

[18] *Id.* (quoting *Anderson v. City of Seattle*, 78 Wn.2d 201, 202, 471 P.2d 87 (1970)).

[19] *Id.*

[20] *See Postema v. Postema Enters., Inc.*, 118 Wn. App. 185, 198, 72 P.3d 1122 (2003) ("Although a court cannot use a statement of intent to contradict the plain language of a statute, clear statements of intent consistent with the statutory language clarify a statute's meaning.").

[21] *Watson*, 146 Wn.2d at 954.

[22] 132 Wn.2d 660, 940 P.2d 642 (1997).

[23] *Id.* at 661.

ture intends to provide a civil cause of action for wrongful injury or death of a minor child to a mother or father, or both, if the mother or father has had significant involvement in the child's life, including but not limited to, emotional, psychological, or financial support.[24]

Accordingly, we must read the current statute to define support to include "but not limited to, emotional, psychological, or financial support."

¶20 This court's 2003 decision in *Postema v. Postema Enterprises, Inc.*[25] is consistent with that reading. There, this court determined that a jury instruction defining "support" as limited to " 'providing for the child's material well being,' " including " 'payment of money or contributing to housing, food, clothing, or healthcare services of the child' " was erroneous.[26] In reaching this conclusion, this court looked to the above 1998 statement of legislative intent. In doing so, this court concluded that RCW 4.24.010 provides a statutory cause of action for a parent who provides emotional, psychological, or other support to his or her child.[27]

¶21 Here, there is no dispute that both Bunch and Kozel regularly contributed to the support of Ashlie prior to their divorce in 2001. Likewise, they both regularly contributed to support her through 2003, when Ashlie moved to Washington to live with Bunch. The factual and legal dispute is whether Kozel regularly contributed to support Ashlie after 2003.

¶22 According to her declaration, Kozel "spoke with [Ashlie] regularly by phone, at least once a week, until she was admitted to inpatient facilities."[28] But, according to the record, Ashlie was admitted to inpatient treatment facili-

---

[24] LAWS OF 1998, ch. 237, § 1.

[25] 118 Wn. App. 185, 72 P.3d 1122 (2003).

[26] *Id.*

[27] *Id.* at 197-98.

[28] Clerk's Papers at 57.

ties several times between 2003 and 2007, and for the last time in March 2007. Significantly, Kozel does not testify that she spoke with Ashlie at any time from March 2007 to the time of Ashlie's death in January 2008.

¶23 Kozel also testified in her declaration that she "sent [Ashlie] Christmas presents."[29] But the declaration fails to state when this allegedly occurred.

¶24 Bunch replied to Kozel's declaration with his own testimony. In his declaration, he testified that Kozel "did not provide any financial support from the time Ashlie came to live with me and [my wife], to the time of Ashlie's death."[30] He testified further that from 2003 until Ashlie's death, Kozel "did not have a relationship of any kind with Ashlie."[31] Significantly, Bunch testified that Kozel never attempted to contact Ashlie while she was in inpatient care.[32] This testimony is consistent with the portion of Kozel's declaration that stated that she had regular phone contact with Ashlie "until she was admitted to inpatient facilities."

¶25 Bunch also summarized his view of the contact between Ashlie and Kozel during the period from 2003 until Ashlie's death as follows:

- December, 2004: [Kozel] sent Ashlie a Christmas present;
- December, 2007: Ashlie had one, five-minute phone conversation with [Kozel], which Ashlie reported did not go well;
- Unknown dates: On two occasions Ashlie called [Kozel's] home to speak with [her sister]. [Kozel] refused to allow Ashlie to speak with [her sister] and instead told her that [her sister] was doing well. At no time during this approximate five year period did [Kozel] allow Ashlie to speak with [her sister].[33]

---

[29] Clerk's Papers at 57.

[30] Clerk's Papers at 69.

[31] Clerk's Papers at 69.

[32] Clerk's Papers at 69-70.

[33] Clerk's Papers at 70.

¶26 Notwithstanding this detailed testimony from Bunch, Kozel neither refuted his assertions nor provided any further information regarding the nature and extent of her support of Ashlie. Thus, the record shows that Kozel did not provide any financial support to Ashlie after her move to Washington to live with her father in 2003. The record also shows there was only one five minute telephone communication between Kozel and Ashlie after March 2007 until her death in January 2008. The trial court was entitled to conclude from this record that Kozel failed to establish that she contributed to Ashlie's support, which includes but is not limited to "emotional, psychological, or financial support," after March 2007.

¶27 Consideration of support alone does not end our inquiry. We must shift our focus to the remaining question: whether Kozel demonstrated that she ***regularly contributed*** to the support of [Ashlie]," as the statute requires.[34] Because the legislature did not define "regularly," a standard dictionary definition controls.[35] The *American Heritage Dictionary* definition of "regular" includes:

1. Occurring at fixed intervals; periodic: regular payments.

2. Occurring with normal or healthy frequency

3. Not varying; constant.[36]

¶28 Here, Bunch's testimony that Kozel provided no financial support for Ashlie after 2003 is unrefuted. Additionally, the following testimony of Bunch is unrefuted:

[Kozel] did not provide any financial, emotional, psychological or other support during this almost five year period. [Kozel] did not communicate to me any desire to have Ashlie return to her home to live with her or even to visit. In fact, she made it clear to me that she did not want Ashlie to return to her home at any time. When I would offer to send [Kozel] pictures of Ashlie as she grew older, she refused. When I would call [Kozel] to update

---

[34] (Emphasis added.)

[35] *Watson*, 146 Wn.2d at 954.

[36] The American Heritage Dictionary 1521 (3d ed. 1992).

her on Ashlie's condition, she would simply brush it off saying, "well, good luck with that." She never asked to speak to Ashlie or express any concern for her welfare. When [Kozel] purchased a second home, she refused to supply either Ashlie or myself with the address. In my opinion, [Kozel] wanted nothing to do with Ashlie.[37]

¶29 In sum, Kozel has provided no evidence in this record to show that she "regularly contributed" to Ashlie's "support," as that word is broadly defined, after March 2007. This record also supports the determination that she did not "regularly" contribute to Ashlie's "support" between 2003 and March 2007. This failure is fatal to her claim that the trial court abused its discretion in denying her motion to intervene pursuant to CR 19 and RCW 4.24.010.

¶30 In an attempt to avoid these evidentiary and substantive deficiencies, Kozel makes several arguments. None of them are persuasive.

¶31 Kozel first argues that the use of the past tense both in the 1998 amendment to this statute and in the related statement of legislative intent means that the legislature "recognized a cause of action for a parent whom, *at any time*, provided for her child."[38] We disagree.

¶32 This argument relies on a faulty premise: that a statement of legislative intent may contradict the plain language of a related statute. Here, RCW 4.24.010 states in relevant part:

A mother or father, or both, who *has regularly contributed to the support of his or her minor child* . . . may maintain or join as a party an action as plaintiff for the injury or death of the child.[39]

¶33 The related statement of legislative intent states:

It is the intent of this act to address the constitutional issue of equal protection addressed by the Washington state supreme

---

[37] Clerk's Papers at 71.

[38] Brief of Appellant at 8 (emphasis added).

[39] (Emphasis added.)

court in *Guard v. Jackson*, 132 Wn.2d 660 (1997). The legislature intends to provide a civil cause of action for wrongful injury or death of a minor child to a mother or father, or both, if the mother or father ***has had significant involvement in the child's life, including but not limited to, emotional, psychological, or financial support*.**[40]

¶34 As this court stated in *Postema*, when construing the word "support" in this statute, "a court cannot use a statement of [legislative] intent to contradict the plain language of a statute."[41] The plain words of this statute that are at issue here are "has regularly contributed to the support of" a minor child. Thus, the words "has had significant involvement in the child's life" in the statement of legislative intent cannot contradict these words. As discussed above, the plain meaning of the word "regular" cannot be contradicted by words in the statement of legislative intent.

¶35 We also reject her argument because the words in the statement of legislative intent on which she relies focus on a different issue: the scope of the word "support" in the context of the legislature dealing with a constitutional issue. The words "regularly contributed" are distinct from the scope of the word "support." Moreover, "regularly contributed" has nothing to do with the constitutional issue underlying the legislature's amendment of the statute in 1998.

¶36 The correct focus is on the legislature's use of the past tense in the statute—"has regularly contributed to the support of his or her minor child." The use of the word "has" imposes a temporal element. The right to sue for this statutory cause of action arises from "regularly" contributing to the support of one's minor child prior to the injury or death of that child, not at some later time. The question is whether this regular contribution of support prior to the

---

[40] LAWS OF 1998, ch. 237, § 1.

[41] *Postema*, 118 Wn. App. at 198.

death or injury of a minor child includes any other temporal element.

¶37 In *Blumenshein v. Voelker*,[42] Division Three of this court considered whether a mother had standing under RCW 4.24.010 to sue for her daughter's injuries that allegedly arose from a bicycle-car accident.[43] Joan M. Voelker was the driver of the car that struck the minor child.[44] Christine Blumenstein, the mother of the child, had "rarely contributed to the support of" the child prior to the accident.[45] Moreover, she "had not had significant contact with" the child for quite some time prior to the accident.[46]

¶38 In deciding that Blumenstein did not have standing under the statute, the court stated:

> The triggering event giving rise to Ms. Blumenshein's asserted cause of action was Felicia's injury on July 12, 1999. Plainly, the legislature intended the necessary parent involvement to be viewed at the time of the accident, not some earlier or later time. Without the injury no claim could exist.[47]

¶39 We agree with this reasoning. RCW 4.24.010 creates a statutory cause of action for either or both parents that did not exist at common law. Without the death of Ashlie, no claim for destruction of any parent-child relationship between her and either parent would exist. Thus, it is reasonable to strictly construe this statute, which is in derogation of the common law, to limit its application to a time at or near the time of the death or injury of the minor child.[48]

¶40 More importantly, the legislature has taken no action in response to *Blumenshein* since that decision was

---

[42] 124 Wn. App. 129, 100 P.3d 344 (2004).

[43] *Id.* at 132-33.

[44] *Id.*

[45] *Id.* at 132.

[46] *Id.*

[47] *Id.* at 135.

[48] *McNeal v. Allen*, 95 Wn.2d 265, 269, 621 P.2d 1285 (1980) (statutes in derogation of the common law must be strictly construed).

handed down in 2004. In stark contrast, the legislature amended the former version of RCW 4.24.010 in 1998 in direct response to the 1997 *Guard* opinion from the supreme court. Had the legislature disagreed with *Blumenshein's* determination of legislative intent regarding the significance of timing, it could have amended the statute.[49] But it did not do so.

¶41 Accordingly, we reject Kozel's argument that the relevant time for purposes of "regularly contributing to the support" of one's minor child for purposes of this statute is "at any time" prior to the death of that child. Rather, we conclude that the legislature intended that either or both parents must show that they "[had] regularly contributed to the support" of the child at or near the time of the death or injury of that child.

¶42 Kozel also argues that strict construction of this statute is not necessary because it is for the jury to decide the differing contributions of the parents in deciding damages under the statute.[50] Because this argument impermissibly merges separate functions, we reject it.

¶43 The damages portion of RCW 4.24.010 states as follows:

> This section creates only one cause of action, but if the parents of the child are not married, are separated, or not married to each other damages may be awarded to each plaintiff separately, as the trier of fact finds just and equitable.

Kozel appears to argue that a broad reading of eligibility to intervene as a parent who "has regularly contributed to the support" of one's minor child is required because of the above language. Specifically, she claims that a trier of fact must determine the amount of damages based on just and equitable principles in the case of attenuated involvement of a parent in the minor child's life.

---

[49] *City of Federal Way v. Koenig*, 167 Wn.2d 341, 348, 217 P.3d 1172 (2009) ("This court presumes that the legislature is aware of judicial interpretations of its enactments and takes its failure to amend a statute following a judicial decision interpreting that statute to indicate legislative acquiescence in that decision.").

[50] Brief of Appellant at 13.

¶44 This argument is not persuasive. The trial court, in the exercise of its sound discretion, was charged with the responsibility of determining whether Kozel's CR 19 motion to intervene should have been granted. That function is distinct from the later determination by a trier of fact whether and to what extent to award damages to either or both parents. In short, there is nothing in this statute, CR 19, or any case authority that we are aware of to support this argument.

¶45 At oral argument, Kozel described several hypothetical situations that make our reading of the legislature's intent unlikely. These arguments are not persuasive.

¶46 First, the hypotheticals that she presented have nothing to do with the facts of this case, as evidenced by the record before us. Thus, her claim that the result in this case is unjust is not persuasive.

¶47 Second, as the supreme court stated in *Philippides*, the statutory cause of action established by the legislature here is not to be changed by the courts.[51] The legislature provided a statutory cause of action for wrongful death of a minor child for the child's parents, conditioned on "regularly contributing to the support" of the child prior to death or injury. Any perceived unfairness to these conditions should be addressed to the legislature, not the courts.

¶48 At oral argument, Kozel also claimed that the trial court applied its own thoughts on whether Kozel was a good mother in making its decision to deny her motion. Nothing in this record supports the view that the trial court made its decision on an improper basis. This argument is baseless.

¶49 Under CR 19, the court must determine whether a party is needed for the just adjudication of the action.[52] A party is necessary under CR 19 if her absence from the proceedings would prevent the court from affording complete relief to the existing parties, impair the party's ability

---

[51] *Philippides*, 151 Wn.2d at 390.

[52] *Crosby*, 137 Wn.2d at 306.

to protect an interest related to the subject of the action, or subject an existing party to inconsistent or multiple liabilities.[53] Because Kozel does not have a claim under RCW 4.24.010, the trial court did not abuse its discretion in denying Kozel's motion to intervene. Her joinder to this action is simply not necessary.

¶50 Kozel also claims a right to intervene under CR 24. She did not make this argument below. Consequently, we do not address it on appeal.[54]

¶51 We conclude that the trial court properly exercised its discretion by denying Kozel's motion to intervene. She failed in her burden to show that she "[had] regularly contributed to the support of" Ashlie at the time of the child's death in January 2008.

## EVIDENTIARY HEARING

¶52 Kozel argues for the first time on appeal that the trial court abused its discretion by failing to hold an evidentiary hearing to resolve disputed questions of fact. We disagree.

¶53 Here, Bunch asked the court to hold an evidentiary hearing for live testimony in order to resolve any conflicting evidence whether Kozel should be allowed to intervene.[55] In response to this request, Kozel sought intervention as coplaintiff in this action "without being compelled to travel from Florida to Washington to attend an 'evidentiary hearing' to determine her 'credibility.' "[56] There is nothing in the record to show that she ever requested an evidentiary hearing.

¶54 Kozel cannot now complain that the trial court chose not to conduct an evidentiary hearing that she never

---

[53] CR 19(a); *Cordova v. Holwegner*, 93 Wn. App. 955, 961-62, 971 P.2d 531 (1999).

[54] *State v. Holzknecht*, 157 Wn. App. 754, 759-60, 238 P.3d 1233 (2010); RAP 2.5(a).

[55] Clerk's Papers at 73.

[56] Clerk's Papers at 89.

requested. In such a case, there simply is no abuse of discretion by the trial court.

¶55 Moreover, the quotation showing her response to Bunch's request for an evidentiary hearing shows that she opposed such a hearing. In any event, if she desired to avoid travelling to Washington from Florida to attend a hearing, she offered no alternatives—telephone or video conference—to address the need she now claims.

¶56 The trial court committed no error in deciding this matter on the declarations and other submissions of the parties.

¶57 We affirm the order denying her motion to intervene.

DWYER, C.J., concurs.

¶58 BECKER, J. (dissenting) — The majority holds that the statutory cause of action for wrongful death of a child, RCW 4.24.010, is available only to those parents who made regular contributions to the child's support "at or near the time of the death or injury of that child." Majority at 866. I respectfully dissent. The temporal limitation is not found in the statute, it frustrates legislative intent, and it is based on a misreading of precedent.

¶59 Ashlie Bunch was born to a substance-addicted mother. Ashlie and her sister, two years younger, were placed in foster care, where they were abused. Steven Bunch and his wife, Amy Kozel, adopted them when Ashlie was four years old. They knew about the addicted birth mother but wanted to provide the girls "with love, affection, and hope for a meaningful life." Ashlie suffered from mental illness and brain injury caused by fetal alcohol syndrome. Compl. at 5-6.

¶60 The parents divorced in 2001 when Ashlie was nine. Bunch moved to Washington State. Kozel remained in Florida with the two girls. Bunch visited twice. During this

time, Ashlie began to assault her younger sister. Finally, Kozel decided she had to separate the two girls. In 2003, she sent Ashlie to live with her ex-husband and his new wife in Washington. Kozel Decl. at 1-2.

¶61 According to the complaint Bunch filed in 2007, Ashlie was committed involuntarily to a mental health hospital when she was 14. By this time, she already had a long documented history of suicidal thoughts and plans. After this hospital stay, she was adjudicated as gravely disabled and sent to McGraw Residential Center for inpatient psychiatric treatment and care. She was diagnosed as being dangerous both to herself and to others. Compl. at 6.

¶62 During the six months Ashlie spent at McGraw before she died, she made frequent attempts to kill herself. The protocol for watching over her included five minute checks. She was to sleep with the door open and to have all strings and shoelaces removed. According to the complaint, the staff did not follow this protocol. On the night Ashlie took her own life, someone had given shoelaces to Ashlie at her request. Her door remained closed all night, and the monitoring logs were presigned to indicate five minute checks. Ashlie strangled herself with the shoelaces and died at about 4:30 a.m. Her body was not discovered until almost 8 a.m. Compl. at 8.

¶63 These allegations, if true, reveal the anguish that must have been experienced by all of the adults who had a hand in raising Ashlie. If her death was wrongful, I see no basis in the statute for limiting the right of recovery to the father simply because he was there for Ashlie's last four years of life. Surely, the mother who lived with Ashlie and cared for her from age 4 to age 11—two of those years as a single mother—is also entitled to make a claim. Kozel's declaration states, "From the date I adopted Ashlie until the date I sent her to live with Steven, I paid for Ashlie's living expenses, housed her, clothed her, fed her, and gave her all the emotional and financial support I could. I was her mother in every respect." Clerk's Papers at 57. This is sufficient to give her standing to sue.

¶64 McGraw contends that to have standing, the mother must be able to show significant involvement with the child at the time of her death. The statute does not say this. It is true that a parent must have had "significant involvement" in the child's life in order to recover. *Philippides v. Bernard*, 151 Wn.2d 376, 384, 88 P.3d 939 (2004). But that involvement does not have to be contemporaneous with the injury or accident. The statute uses the past tense—"A mother, or father, or both, who has regularly contributed to the support of his or her minor child." RCW 4.24.010. This language does not foreclose recovery by a parent who has made regular contributions to a child's support in the past, and then becomes geographically or otherwise separated from the child as a result of an event like parental divorce.

¶65 The majority gives inadequate weight to the legislature's own statement of intent. The intent of the legislature is to allow a parent to sue for wrongful injury or death of a minor child if the parent "has had significant involvement in the child's life." Laws of 1998, ch. 237, § 1. The use of the past tense here is consistent with the statutory language "has regularly contributed" and should be interpreted to mean at any time before the child's injury or death. This interpretation does not contradict the plain meaning of "regular." The majority finds a conflict where none exists.

¶66 A court may consider underlying legislative purposes, background facts, and statutory context to determine the plain meaning of a statute. *Postema v. Postema Enters., Inc.*, 118 Wn. App. 185, 198 n.30, 72 P.3d 1122 (2003). "If statutory language is susceptible of two constructions—one of which will promote the purpose of the statute and the second of which will defeat it—courts will adopt the former." *State v. Wiggins*, 114 Wn. App. 478, 482, 57 P.3d 1199 (2002). The interpretation I propose promotes the purpose of the statute, which is to provide a cause of action, not deny one. The majority's interpretation will necessarily, contrary to legislative intent, deny standing to some parents even though the parent has had significant involvement in the child's life. If a parent's involvement with a child has lapsed

or diminished over time, that is a consideration a jury can take into account when deciding damages.

¶67 The authority offered by McGraw and relied upon by the majority for a strict temporal limitation is *Blumenshein v. Voelker*, 124 Wn. App. 129, 100 P.3d 344 (2004). *Blumenshein* arose from a bicycle accident that injured five-year-old Felicia Felch in Spokane in July 1999. At the time, Felicia and her brother were living with their father. Their mother, Christina Blumenshein, was living in a homeless shelter in Seattle. Due to drug addiction, instability, and incarceration, Christina had very little contact with her children and paid no support. The father obtained a settlement on behalf of Felicia and released his own interests in it. The children were later placed in foster care. One and a half years after the accident, Christina Blumenshein straightened out her life, reunified with her children, and gained custody. In 2002, she filed a negligence action on behalf of her son and herself concerning the injury to Felicia. Her own claim was for loss of consortium under RCW 4.24.010. That claim was dismissed on summary judgment. On appeal, Christina asserted a theory of an "after acquired right to sue" based on her involvement with Felicia after the accident. It was in this context that this court said the legislature intended parent involvement "to be viewed at the time of the accident, not some earlier or later time. Without the injury no claim could exist." *Blumenshein*, 124 Wn. App. at 135.

¶68 I believe *Blumenshein*'s result is correct, and I do not disagree with the rationale so long as the statement about viewing parent involvement "at the time of the accident" is understood to mean that a court looks back *from* the time of the accident to see whether the parent ever regularly contributed support. That was all the court in *Blumenshein* needed to say because the record showed that the mother "did not have significant involvement in Felicia's life until one and a half years after the accident." *Blumenshein*, 124 Wn. App. at 135.

¶69 The majority reads *Blumenshein* as directing a court to evaluate the quality of a parent's involvement at or near the time of the injury or death. While I do not believe this reading of *Blumenshein* is correct, Kozel should be allowed to litigate her claim even if it is. *Blumenshein* was decided on summary judgment, whereas the present case was decided on a motion to intervene. Kozel has not had the benefit of a record reviewed with all inferences being taken in the light most favorable to her. McGraw summarizes Kozel's involvement as follows: "Kozel had not seen Ashlie in the five years preceding her death; she did not talk with Ashlie or her providers about her mental illness; she did not invite Ashlie to visit her; and notably, she did not attend Ashlie's memorial service after her death." McGraw also asserts that Kozel did not provide financial support to Ashlie after sending her to live in Washington. Br. of Resp't at 17-18. In my opinion, such evidence goes to the question of whether Kozel suffered damage. It is far too one-sided to be accepted by a court as a basis for depriving Kozel of the right to make a claim. The brief record on appeal suggests that Ashlie was a danger to her sister, that Kozel's agreement to send Ashlie to Washington was an effort to protect the sister, that the parents dealt with their responsibility for financial support by each supporting one child, and that Ashlie was too sick to be invited for visits to Kozel's home in Florida. When a family has struggled with problems of this magnitude, it is superficial to judge the depth of a parent's emotional support by counting telephone calls and Christmas presents. Kozel's absence from a memorial service for Ashlie held on the other side of the country by her ex-spouse does not prove anything relevant to her standing in this matter.

¶70 I conclude Amy Kozel has standing to bring a claim for her daughter's death under RCW 4.24.010. It follows that the trial court erred in denying her motion to intervene under CR 19. Kozel's absence from the proceedings impaired her ability to protect her interest and thus made her a necessary party.